STEVEN G. KALAR
Federal Public Defender
Northern District of California
SOPHIA WHITING
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:   (415) 436-7700
Facsimile:   (415) 436-7706
Email:        Sophia_Whiting@fd.org

Counsel for Defendant Martel-Carcamo

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | **Case No.:** CR 19-497 CRB |
|---|---|
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| JOSSAN ARIEL MARTEL-CARCAMO, a.k.a. Ariel Miranda | |
| Defendant. | |

## INTRODUCTION

Jossan Ariel Martel-Carcamo promptly accepted responsibility for being involved with low-level drug dealing, which occurred in 2019. Mr. Martel-Carcamo has already spent five months in federal custody. He has only one prior conviction, for which he spent 46 days in jail. A sentence of six months is appropriate given this is by far the longest sentence Mr. Martel-Carcamo has ever served, incarceration during the pandemic is harsher than ever before, he will be deported upon completion of his sentence, and a sentence of six months avoids unwarranted sentencing disparities. A longer sentence will not provide additional general deterrence or combat the fentanyl crisis, and may compound racial disparities raised by the Federal Initiative for the Tenderloin (FIT).

## BACKGROUND

Mr. Martel-Carcamo grew up in Jalaca, a small village in Honduras. He lived in an adobe house with just his mother. Growing up, he learned that his mother had become pregnant from a sexual assault. He never met his father, the man who committed this gruesome act. Mr. Martel-Carcamo's mother never had any other children, and he felt an overwhelming responsibility to care for her. She worked cleaning houses, and was barely able to support them. At just 10 years old, Mr. Martel-Carcamo began working. He worked with his uncle while he drove long haul trucks, mostly transporting tomatoes across the country and into El Salvador. He left school in 7th grade to work full time.

Towards the end of his teens, Mr. Martel-Carcamo's girlfriend became pregnant. He realized he would have to make more money to support his new family, in addition to his mother. That is when he decided to make the difficult journey to the United States.

Since that initial arrival, Mr. Martel-Carcamo was deported twice, both times in 2016. He then stayed in Honduras for two years. He was long haul trucking again, was expecting a child, and was happy. Unfortunately, in 2018, he was hauling a trailer of wood when the truck caught fire. The flames burned his entire body and left scars covering his arms, chest, and torso. He was in the hospital for two-and-half months, followed by three months of bed rest at home. After he recovered, trauma prevented him from returning to trucking. Yet, he had to provide for his family. He only returned to the U.S. because he did not know how else he would be able to earn any income.

His most recent journey back to the United States was harrowing. Coyotes kidnapped him and kept him near the border for a month, until he was able to escape. He worked in Los Angeles to try to evade the coyotes, who would know to look for him in the Bay Area. He did construction in Los Angeles for six months. After that job ended, he made his way back to San Francisco. He began working as a dishwasher at a seafood restaurant in the Ferry Building. He worked from 2 p.m. to midnight, but could still not afford his own expenses in addition to supporting his children and mother in Honduras. It was during this time, in 2019, that he was arrested for the offenses in this case. After eight months working at the restaurant, he moved to Denver to join acquaintances who had found better job opportunities, so he could stop selling drugs. He worked for a painting company

and, in the winter, he did snow removal. He worked in Denver for a year and four months, until September 2020.

It was just days after his return to San Francisco in September that Mr. Martel-Carcamo was arrested on the federal warrant in this case. There is no indication that Mr. Martel-Carcamo was still involved in drug dealing by the time he was arrested on the federal warrant. In September 2020, he was not arrested selling drugs nor did he have drugs on him.

Mr. Martel-Carcamo knows the ultimate outcome in this case is his deportation. Upon his return to Honduras, he is ready to return to trucking. He is a young man who wants to be with his family.

## DISCUSSION

### I. The Sentencing Guidelines (18 U.S.C. § 3553(a)(4))

The government and Mr. Martel-Carcamo agree that the Adjusted Offense Level is 13. He has one prior conviction for which he was on probation at the time of the offense, which places him in Criminal History Category II. Presentence Investigation Report (PSR) ¶ 10-12. His advisory Guideline range is therefore 15 to 21 months.

Although the Court must remain mindful of the Sentencing Guidelines recommendation, the advisory Guideline range is not presumptively reasonable and it cannot be given any more or less weight than any other factor listed in section 3553(a). *United States v. Autery*, 555 F.3d 864, 872 (9th Cir. 2009); *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The court's paramount concern must be to "'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *Carty*, 520 F.3d at 991. A sentence of six months, followed by three years of supervised release, best aligns with the goals and factors of section 3553(a) for the following reasons.

### II. Mr. Martel-Carcamo's Circumstances Warrant a Downward Departure (18 U.S.C. § 3553(a)(1))

As detailed in the Background section above, Mr. Martel-Carcamo's history and circumstances counsel a downward variance from the advisory range. *See* 18 U.S.C. § 3553(a)(1). He has been

responsible for providing for his family since he was just *ten years old*. As the only man of the house, he felt an extreme pressure from an incredibly young age. This pressure, combined with the lack of education, severely undermined Mr. Martel-Carcamo's ability to develop good judgment. His actions arise not out of malice or greed, but out of desperation. The government wants to paint Mr. Martel-Carcamo as a ruthless drug dealer, when in fact, Mr. Martel-Carcamo has experienced unimaginable pain and poverty, yet tried repeatedly to make a legitimate living. Just when he thought he could make life work in Honduras, despite the abysmal economy, he was burned alive while trying to do his job.

Mr. Martel-Carcamo has never taken the decision to leave his family or to be involved with drugs lightly. This time, though, is different. There is no reason to believe Mr. Martel-Carcamo will again suffer a freak accident that put him out of the only job available to him in Honduras. He also would never again put himself through the trauma of a kidnapping by coyotes. This being his first federal case and first significant sentence, he also now know the dire consequences of returning. He will not return.

### III. A Downward Departure is Appropriate to Reflect the Severity of the Offense (18 U.S.C. § 3553(a)(2)(A))

Furthermore, a downward departure is warranted because this is a less serious offense compared with other federal crimes. *See* 18 U.S.C. § 3553(a)(2)(A). Mr. Martel-Carcamo takes responsibility for his criminal conduct in the instant offense and recognizes that selling any amount of drugs negatively impacts public health. However, federal sentencing laws "that were designed to focus penalties on the most serious drug traffickers have resulted in long periods of imprisonment for many offenders who performed relatively minor roles in the drug trade." Collins and Vakharia, *Criminal Justice in the Fentanyl Era: One Step Forward, Two Steps Back*, DRUG POLICY ALLIANCE (January 2020) at 3 (hereinafter *Criminal Justice in the Fentanyl Era*).[1]

The fact is that street-level drug sales are—or should be—a minor offense compared to the vast majority of federal prosecutions, including drug prosecutions. If not for the FIT initiative, this offense would not be prosecuted in federal court. To the contrary, federal drug cases were intended to present

---

[1] Available at https://drugpolicy.org/sites/default/files/dpa-cj-reform-fentanyl-era-v.3_0.pdf.

more serious facts, such as substantially larger quantities of controlled substances, weapons, or an organized drug trafficking operation. Mr. Martel-Carcamo's case is minor in comparison.

### IV. A Sentence of Six Months Affords Adequate Deterrence and Mr. Martel-Carcamo's Inevitable Deportation Minimizes Public Safety Concerns (18 U.S.C. §§ 3553(a)(2)(B) and (C))

Mr. Martel-Carcamo also respectfully contends that a below-guidelines sentence, given his difficult time in custody and inevitable deportation, provides sufficient deterrence and public protection.

The five months Mr. Martel-Carcamo has already spent at Santa Rita Jail during the pandemic have been hard time. He has been in and out of quarantine, which means he could not attend court, counsel could not schedule meetings with him, he had no access to programming or recreational spaces, and he lived in constant fear of catching the virus. The longer Mr. Martel-Carcamo remains in custody, the greater the risk to his health. This is an exceptionally difficult and dangerous time to serve a sentence. Time in custody now is much harder than under normal circumstances and will not change anytime soon. This is especially true at Santa Rita Jail, which is notably more expensive and restricted than other jails or prisons. Santa Rita charges multiple dollars for calls that are free elsewhere, gives inadequate and untimely meals, and has limited programming, even in the best of times. Thus, Mr. Martel-Carcamo makes the request for a downward departure in consideration of the fact that a six-month sentence is a much harsher sanction than under normal circumstances.

Furthermore, Mr. Martel-Carcamo's detention and removal from the United States following his release from federal imprisonment, and his plan to stay in Honduras, minimize any public safety concerns. Unlike a similarly situated citizen defendant, Mr. Martel-Carcamo will not return to the local community following completion of his sentence. He will literally be removed from the community. He knows he would face steep penalties if he were to return, including supervised release violations, illegal re-entry charges, and federal charges for any new offense conduct.

### V. A Higher Sentence Will Not Provide General Deterrence or Combat the Fentanyl Crisis, and May Compound Racial Disparities.

Mr. Martel-Carcamo should not be treated more harshly because he happened to have drugs that tested positive for fentanyl on one occasion. Punishing individuals at the very lowest level of the

opioid crisis "repeat the mistakes that epitomize the failed war on drugs, while undermining efforts to reform our criminal justice system and pursue a public health approach to drug use." *Criminal Justice in the Fentanyl Era* at 3.

First, street-level dealers often do not understand or control what they are selling, and may not even realize that fentanyl is in their product. Fentanyl is often added to products or disguised as another drug by those higher up in the supply chain, so that street-level dealers do not know that the product contains fentanyl or how much it contains. As a recent study on the over-criminalization of fentanyl points out: "This begs the question: how can a tough sentence be a deterrent for behavior that people cannot prevent and may not even know they are engaging in?" *Criminal Justice in the Fentanyl Era* at 9.

Furthermore, "increasing already high penalties for drug offenses is not effective because 1) Most people do not expect to be apprehended for a crime, are not familiar with relevant legal penalties, or criminally offend with their judgment compromised by substance abuse or mental health problems and; 2) Those who are apprehended and sentenced are often in the lower levels of the drug trade and are readily replaced by other sellers willing to fill their roles." *Criminal Justice in the Fentanyl Era* at 15 (quoting Marc Mauer of The Sentencing Project in a letter opposing increased penalties for fentanyl).

Attempting to solve the crisis at the sentencing stage also serves to compound racially disparate drug enforcement. "A recent analysis of federal fentanyl sentencing revealed that 75% of all individuals sentenced for fentanyl trafficking were people of color, suggesting that fentanyl enforcement already mirrors other disparate drug enforcement." *Criminal Justice in the Fentanyl Era* at 3. Specifically, the government's FIT initiative displays clear markers of disparate enforcement. The government has previously refused requests to provide any data regarding race, nor even share the list of defendants charged under FIT. However, after attempting to individually identify street-level drug cases in the Tenderloin charged since the start of the FIT initiative, a review of 71 qualifying cases found that 85.5% involve Hispanic or Latino defendants. Only 2.8% are white.



Furthermore, the few white defendants who *are* charged receive much more leniency. The average sentence for a Hispanic or Latino defendant is 180.32 days, while for white defendants it is just 18.5 days. One white defendant, of only two white defendants identified, was also the *only* case in this analysis that was granted diversion by the government. This white defendant was arrested with **39.5 grams gross of fentanyl** and 7.7 grams of methamphetamine. *United States v. Seth Carus*, CR 19-305 RS.

There are already harsh penalties in effect for drug distribution that disproportionally target communities of color. Spending additional government funds on a powerless and replaceable defendant like Mr. Martel-Carcamo, who will deported regardless, is a waste of resources that could be better used on evidence-based public health and harm reduction approaches.

### VI. A Sentence of Six Months is Appropriate to Avoid Unwarranted Disparities (18 U.S.C. § 3553(a)(6))

The Court is well aware of the number of analogous cases sentenced to time served in this district. The following seven cases are a sampling of those **involving fentanyl** and at least Criminal History Category II. The Court determined that a sentence of time served—ranging in effect from 1 month, 15 days to 8 months, 11 days—was warranted. The government's position has not been consistent, although the resulting sentences largely have.

| Case Name | Federal Case No. | CHC | FOL | Range | Sentence |
|---|---|---|---|---|---|
| U.S. v. Vallesteros | 19-CR-00625 VC | IV | 15 | 30-37 | 5 months 20 days |
| U.S. v. Rosales-Avila | 19-CR-00536 VC | III | 12 | 15-21 | 6 months, 10 days |
| U.S. v. Trejo | 19-CR-00535 RS | II | 15 | 21-27 | 6 months, 18 days |
| U.S. v. Galeas-Raudales | 19-CR-00660 EMC | III | 15 | 24-30 | 3 months, 23 days |
| U.S. v. Luque | 19-CR-00627 WHO | III | 10 | 10-16 | 6 months, 10 days |
| U.S. v. Salazar | 20-CR-00307 EMC | II | 10 | 8-14 | 1 month, 15 days |
| U.S. v. Mehary | 19-CR-00458 WHO | V | 12 | 27-33 | 8 months, 11 days |

## CONCLUSION

For the aforementioned reasons, Mr. Martel-Carcamo respectfully requests the Court sentence him to six months and three years of supervised released.

Dated:   February 10, 2021          Respectfully submitted,

STEVEN G. KALAR
Federal Public Defender
Northern District of California

                    /S
SOPHIA WHITING
Assistant Federal Public Defender